## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 22 2020, 9:10 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Bryan L. Ciyou
Alexander N. Moseley
Ciyou and Dixon, P.C.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

JoAnn Jacob Krantz
Kristin T.M. McLaughlin
Fine & Hatfield, P.C.
Evansville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In re the Matter of the Paternity of: C.A.S.R. *(Minor Child),* | July 22, 2020 |
| | Court of Appeals Case No. 19A-JP-1527 |
| Tara Marie Seitz, *Appellant-Petitioner,* | Appeal from the Warrick Superior Court |
| v. | The Honorable Leslie C. Shively, Special Judge |
| Christopher Adam Rhodaback, *Appellee-Respondent,* | Trial Court Cause No. 87D02-1206-JP-145 |

**Robb, Judge.**

# Case Summary and Issue

[1] Since a paternity decree issued in 2012, Tara Seitz ("Mother") and Christopher Rhodaback ("Father") have shared joint legal custody of their son, C.A.S.R. ("Child") with Mother having primary physical custody of Child and Father exercising parenting time. In 2017, Father filed a motion to modify primary physical custody and the trial court granted the motion. Mother appeals and raises one issue for our review, namely whether the trial court's order modifying primary physical custody to Father was clearly erroneous. Concluding it was not, we affirm.

# Facts and Procedural History

[2] Mother and Father are the biological parents of Child, born January 31, 2012.[1] The parties had been in a relationship for some time but broke up several weeks before Child was born. Mother also has three other biological children, one teenage daughter she shares with her ex-spouse, Kurt, and two other adult children. Mother and Kurt share physical custody of their daughter and exercise equal parenting time.

[3] Since 2011, Mother has been employed as a team leader with the American Red Cross supervising blood drives, which requires some travel within a two-

---

[1] Child had a twin brother, Z.E.R., who died in his sleep approximately five and a half months after birth while in Father's care.

hour radius of Evansville. Mother works approximately forty hours each week working shifts ranging from 5:00 a.m. to 9:30 p.m. depending on the location of the blood drive. Mother receives her schedule approximately two weeks in advance. Father works at a bank forty hours each week from 8:30 a.m. to 4:00-5:00 p.m. and works the occasional Saturday from 8:00 or 9:00 a.m. to noon.

[4] On June 4, 2012, Mother filed a petition to establish paternity. The trial court subsequently issued an order establishing paternity and awarding joint legal custody with Mother having primary physical custody of Child. Since July 2012, Mother has resided with Nancy, her mother and Child's maternal grandmother ("Maternal Grandmother"). In April 2013, Father married his wife, Amanda, Child's stepmother ("Stepmother").

[5] In 2013, the parties entered into an agreed entry regarding child support and other matters, which was approved by the trial court. In their March 12, 2013 Agreed Entry, the parties agreed to continued joint legal custody with Mother having primary physical custody and Father having parenting time each Monday and Wednesday evening from 5:30-7:30 p.m. and every other weekend from 5:30 p.m. on Friday to 8:00 a.m. on Monday. They agreed that "any evening or weekend Mother is unable to care for [C]hild, Father shall have [the] right of first refusal to parenting time" with Child. Appellant's Appendix, Volume 2 at 48. In addition, the parties agreed to change Child's legal name from C.A.R. to C.A.S.R. *See id.* at 47. From October 2013 to April 2015, Father and Stepmother lived in Michigan before moving back to Indiana.

[6] On July 15, 2015, the trial court approved another agreed entry pursuant to which the parties agreed to reduce Father's child support payments, and agreed that when Child enters preschool, they would share any costs equally. With respect to Father's parenting time, they agreed it would be at a minimum every other Friday from 5:00 p.m. through Monday at 8:00 a.m., as well as every Monday and Wednesday from 5:30-8:30 p.m. *See id.* at 51-52.

[7] In January 2016, Mother was arrested for domestic battery against Father in the presence of Child. *See* Exhibits, Volume I at 229; *see also* Appellant's App., Vol. 2 at 73. As a result, a no contact order was issued requiring Father and Maternal Grandmother to communicate regarding Child. Sometime in 2017, Maternal Grandmother began primarily caring for Child while Mother worked. Because the parties were unable to agree on a preschool for Child to attend, he was not enrolled in any preschool. In July 2017, Mother enrolled Child in Kindergarten at Hebron Elementary School without first consulting Father.

[8] On August 24, 2017, Father filed his Petition to Modify Custody alleging a material change in circumstances had occurred since the last custody order – the July 2015 Agreed Entry. Specifically, Father alleged, in part:

> 2. Child is being raised in a maternal grandparent headed family, which is causing developmental, behavioral and emotional problems for the parties' Child.

> 3. Child has not participated in early childhood education to be prepared for Kindergar[t]en.

> 4. Mother . . . has unreasonably delayed Kindergar[t]en enrollment.

> 5. . . . Father should have primary physical and legal custody of the Child.

Appellant's App., Vol. 2 at 54. Father also filed a verified petition for the appointment of a guardian ad litem ("GAL"). On January 23, the trial court appointed Amy Brandsasse as GAL to represent Child's interests.

[9] Throughout Child's Kindergarten year (2017-2018 school year), Child had behavioral issues in the classroom. These issues were communicated through Child's agenda book that was sent home with Child and required a daily signature by a parent or guardian. Based on behavior, students could earn a daily "Hawk stamp" in their agenda book, which represents "a school wide procedure . . . [of] positive reinforcement instead of . . . negative consequences." Transcript of Evidence, Volume II at 85-86. With respect to the "HAWKS" acronym, "H is honesty, A accountability, W work hard, K show kindness, and S self control." *Id.* at 85. Typically, Mother or Maternal Grandmother signed the agenda book; Father never saw the book. Kelsey Krohn, Child's Kindergarten teacher, reported that Child frequently squeezed his genitals during class, was aggressive with other students, and often untruthful with her. In response to Child's behavior of holding his private parts, Mother met with Ms. Krohn and the Assistant Principal in April 2018. Father was not notified of the meeting. At some point during the year, there was an incident in which another student bit Child. At home, Child was also

untruthful with his parents and, while at his Father's house, he began sleeping in his Father's bed and Stepmother would sleep in another room.

[10] On June 7, 2018, Father filed an Information for Contempt alleging he was entitled to extended summer parenting time but Mother had failed to comply with the extended summer parenting time provision contained in the Indiana Parenting Time Guidelines. *See* Appellant's App., Vol. 2 at 66-67. The trial court held a hearing on June 27 to address summer parenting time. Following the hearing, the trial court ordered that Father have extended summer parenting time and that:

> Mother shall not have the Maternal Grandmother provide care, beyond the work day period, for [C]hild, if Mother is unable [to] care for [C]hild. Mother shall immediately notify the Father and offer him the opportunity for additional parenting time. Mother shall timely provide her work schedules, so the Father can make timely elections.
>
> * * *
>
> Mother shall transport [C]hild at the start of her parenting time and the Father shall transport [C]hild at the end of the Mother's parenting time. The parent responsible to arrange transportation may not utilize a third party for transportation.

Appendix of Appellee, Volume 2 at 2-3. The trial court deferred the contempt issue until a later scheduled hearing.

[11] The GAL filed her first report on July 23, 2018, which summarized her observations and concerns based on documentation and interviews with Child,

Mother, Father, Maternal Grandmother, Stepmother, and Ms. Krohn. Ultimately, the GAL opined that a significant change in circumstances had occurred in that "the evidence shows [Mother] has interfered with the parent/child relationship between [Child] and [Father] by allowing [Maternal Grandmother] to be a primary caregiver for [Child], not communicating about [Child]'s educational needs, medical needs, dental needs, and lacking in overall co-parenting." Appellant's App., Vol. 2 at 87. Therefore, she recommended that physical custody be changed to Father before the 2018-2019 school year, that Child stay in his current school district, and that Mother have parenting time according to the Guidelines with extra parenting time to be offered when Father is not available to care for Child for more than two hours. The GAL identified several problems that Child should immediately begin counseling to address, including learning and demonstrating (1) the identities and roles of his immediate and extended family; (2) appropriate boundaries with his body and others' bodies; (3) truthful behaviors; (4) coping skills regarding his twin brother who passed away, domestic violence between his parents, and the transition from one parent to the other; and (5) sleeping in his own bed. *See id.* at 88.

[12] Following a July 31 hearing during which Ms. Krohn testified about the agenda book, the GAL obtained additional documentation, including Child's Kindergarten agenda book, text messages between Mother and Ms. Krohn regarding Child's behavioral issues, and a binder of text messages between Mother and Father submitted to refute statements Father made to the GAL that were included in her previous report. After reviewing the additional

information, the GAL filed an updated report on September 7, 2018, solidifying her previous recommendation and recommending that Child be seen at Midwest Behavioral Health for counseling within ten days. *See* App. of Appellee, Vol. 2 at 10.

[13] Mother disagreed that Child needed counseling and had Child evaluated by Laura Ellsworth, a licensed counselor, to refute the GAL's recommendation. In September 2018, Mother attended an intake appointment with Ellsworth and Child later met with Ellsworth for two one-hour sessions. Following the sessions, Ellsworth completed a written mental health assessment and recommended the following:

> [C]hild would not be harmed by engaging in counseling with a trained and experienced certified play therapist to assist [C]hild with issues which may not have been addressed by this evaluation, or in the event [C]hild displays future issues (grief, anxiety, boundaries). It is suggested the therapist have a clinical understanding of custody and high conflict co-parenting in order to avoid being put in the middle of the parent issues. It [is] also recommended the parents not be allowed to use [C]hild's counseling for future litigation.

Exhibits, Vol. III at 179.

[14] At a March 26, 2019 hearing, Mother still had not yet submitted the paperwork to change Child's legal name (pursuant to the March 12, 2013 Agreed Entry) and the trial court ordered that she do so within five business days. On the same day, Mother testified that she accepted a new full-time job working

Monday through Friday from 8:00 a.m. to 5:00 p.m. and one Saturday per month.

[15]   Following the presentation of evidence over the course of nine-days,[2] the trial court issued an order awarding joint legal custody to the parties, primary physical custody to Father, and additional parenting time for Mother. The trial court made findings, which will be detailed below, and concluded that the "evidence before the Court, which supports the Court's findings demonstrate a substantial change in circumstances so substantial and continuing as to make the terms of the current child custody order unreasonable such that modification of the child custody order is appropriate." Appealed Order at 15. As such, the trial court ordered that Father be the primary physical custodian of Child, the parties continue to have joint legal custody of Child, and "in the best interest of the [C]hild[,] Mother have parenting time beyond the minimum provided for under the parenting time guidelines." *Id.* Mother now appeals.

# Discussion and Decision

## I. Standard of Review

[16]   On appellate review of judgments with findings of fact and conclusions of law, we "shall not set aside the findings or judgment unless clearly erroneous, and

---

[2] The trial court held hearings on June 27, July 31, September 17, October 12 and 16, 2018, and February 22 and 25, and March 11 and 26, 2019.

due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Ind. Trial Rule 52(A)). When a party has requested special findings of fact and conclusions thereon pursuant to Indiana Trial Rule 52(A),[3] we may affirm the judgment on any legal theory supported by the findings. *Werner v. Werner*, 946 N.E.2d 1233, 1244 (Ind. Ct. App. 2011), *trans. denied.*

[17] When reviewing such findings, we apply a two-tiered standard of review. *Tompa v. Tompa*, 867 N.E.2d 158, 163 (Ind. Ct. App. 2007). We first determine whether the evidence supports the findings and then whether the findings support the judgment. *Id*. We will set aside the trial court's findings and conclusions only if clearly erroneous. *Id*. "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind. 1997). A judgment is clearly erroneous if it applies the wrong legal standard to properly found facts. *Id*.

[18] We do not reweigh the evidence or assess the credibility of the witnesses. *D.C. v. J.A.C.*, 977 N.E.2d 951, 954 (Ind. 2012). Instead, we view the evidence most favorably to the judgment. *Id*. "In conjunction with the Trial Rule 52 standard, there is a longstanding policy that appellate courts should defer to the

---

[3] On July 31, 2018, Mother requested specific findings. *See* Appellant's App., Vol. 2 at 92.

determination of trial courts in family law matters." *D.G. v. S.G.*, 82 N.E.3d 342, 348 (Ind. Ct. App. 2017), *trans. denied*. Our supreme court has stated:

> Appellate deference to the determinations of our trial court judges, especially in domestic relations matters, is warranted because of their unique, direct interactions with the parties face-to-face, often over an extended period of time. Thus enabled to assess credibility and character through both factual testimony and intuitive discernment, our trial judges are in a superior position to ascertain information and apply common sense, particularly in the determination of the best interests of the involved children.

*Best v. Best*, 941 N.E.2d 499, 502 (Ind. 2011).

## II. Modification of Custody

[19] Modification of custody is a determination that rests in the sound discretion of the trial court. *In re Marriage of Sutton*, 16 N.E.3d 481, 484 (Ind. Ct. App. 2014). Accordingly, we review the trial court's decision to modify custody for an abuse of this discretion, affording wide latitude and deference to the trial court. *Collyear-Bell v. Bell*, 105 N.E.3d 176, 183 (Ind. Ct. App. 2018). An abuse of discretion occurs when a decision is clearly against the logic and effect of the evidence before the court. *Russell v. Russell*, 682 N.E.2d 513, 515 (Ind. 1997).

### A. Findings of Fact

[20] First, Mother argues that twenty-two of the trial court's sixty-seven findings are clearly erroneous. Mother challenges findings 8, 18, 22-23, 27, 31, 33, 37-39, 41, 43-47, 49-51, 62, 64, and 67:

8.      Father filed his Information for Contempt on June 7, 2018, regarding the Mother's failure to abide by the extended summer parenting time provisions of the Indiana Parenting Time Guidelines ("IPTG").

* * *

Significant Events Regarding Resolution of Pending Issues

* * *

18.      The [GAL] testified that the Mother was uncooperative in scheduling her preliminary meeting with the [GAL].  The [GAL] testified that the Mother cancelled her first appointment with her and that the Mother only contacted the [GAL] after being ordered to do so.  Conversely, the [GAL] testified that the Father was responsive to the [GAL] in scheduling his appointment, attending the appointment and signing and returning the proper paperwork.

Schooling

* * *

22.      Ms. Krohn . . . testified that the . . . failure to enroll [Child] in preschool affected his socialization and behavior during Kindergarten.

23.      The [GAL] testified that the Mother failed to communicate information relayed by [Child]'s school to home through the Agenda book to the Father.

Custody and Parenting Time

\* \* \*

27.    [Child] attended Kindergarten at Hebron Elementary for the 2017-2018 academic year. The Mother waited until approximately one (1) week prior to school commencing to enroll [Child].

\* \* \*

31.    [Child]'s pediatrician, Dr. Selby, testified that [Child] exhibited "abnormal" behavior or a "tick" in excessively touching his genitals[.] The Mother failed to communicate this information to the Father.

\* \* \*

33.    Despite the [order] as to [Child]'s legal name, the Mother has contributed to [Child]'s identity issues by hyphenating [Child]'s last name on multiple occasions, which is not his legal name.

\* \* \*

37.    The Mother allows [Maternal Grandmother] . . . to co-parent [Child]. The Updated [GAL] Report September 7, 2018 showed that [Child] spent twenty-five (25) days in the care of [Maternal Grandmother] between January 8, 2018 and June 15, 2018, when [Child] could have been with his Father.

38.    The Mother allowed [Maternal Grandmother] . . . to sign [Child] up for extracurricular activities in 2018, such a Hebron basketball, YMCA soccer, and drum lessons, without the Father's knowledge.

39.   The Mother does not communicate or co-parent with the Father as evidenced by the following:

- failure to enroll [Child] in preschool;

- failure to inform the Father of the biting incident at [Child]'s school;

- failure to inform the Father of a school conference regarding [Child]'s behavior [of] touching himself in class;

- failure to inform the Father of extracurricular activities;

- failure to notify the Father of [Child]'s doctor's appointments;

- failure to notify the Father of regular and ongoing behavior problems at school [Child]'s entire kindergarten year;

- failure to notify the Father of opportunities for additional parenting time when the Mother worked late and instead allowing [Child] to be care for by his [M]aternal [G]randmother; and

- failure to inform the Father of the meeting between the Mother, Ms. Krohn and the Assistant Principal in April 2018.

* * *

41.     The Mother testified that she does not think [Child] needs to be in counseling.  The Mother refused to enroll [Child] in counseling despite the [GAL]'s recommendation.

* * *

43.     Rather than choose a therapist to meet the needs of [Child], which were identified in the [GAL's] Report July 23, 2018, the Mother retained Ms. Ellsworth for a mental health assessment[.]

44.     The Mother's expert witness, Laura Ellsworth, MA, rendered a report based upon her mental health assessment of [Child].  It was Ms. Ellsworth's clinical opinion that "*[Child] would not be harmed by engaging in counseling with a trained and experienced certified play therapist to assist [Child] with issues which may not have been addressed by this evaluation, or in the event [Child] displays future issues (grief, anxiety, boundaries).*"  Ms. Ellsworth's clinical opinion was not inconsistent with the [GAL's] Report of July 23, 2018.

45.     The Father scheduled [Child] for an appointment with Midwest Behavioral Health (hereinafter, "MBH").  Mother was notified of the appointment.  The Mother did not appear for the appointment.  Mother did not complete necessary paperwork requested by MBH after notice by the Father that the paperwork needed to be completed.

46.     The next scheduled [counseling] appointment in January 2019 was rescheduled to February 26, 2019 due [to Child's] illness.

47.     On February 25, 2019, the Mother participated for the first time, in [Child]'s counseling.

\* \* \*

49. The Report of July 23, 2018 states that the Mother was not in a domestic relationship based upon GAL's interview of Mother. Mother, however, testified that she has been in a domestic relationship since September 2018 with "Eddie" [who] lives in Oakland City, Indiana. "Eddie" has been with [Child] on two (2) occasions. The Mother failed to report this relationship to the [GAL].

50. Mother's ex-spouse . . . testified that he and the Mother share "equal time" with their biological daughter. However, [he] posted on Facebook that he has had "personal challenges in having to raise [his] daughter alone."

51. The Mother denied ever being arrested. However, the Mother was arrested on January 7, 2016, for domestic battery against the Father in the presence of [Child], a minor less than sixteen (16) years old.

\* \* \*

62. From the end of summer 2018 to February 25, 2019, the Mother did not provide the Father with her work schedule as ordered by this court . . . effectively denying the Father opportunities to enjoy additional parenting time with [Child].

\* \* \*

64. The Mother testified that she knowingly and willfully violated the Order June 27, 2018 that she not utilize a third party to provide transportation for [Child]. The Mother allowed [Maternal Grandmother] to regularly provide transportation for [Child] in direct violation of the Court's Order June 27, 2018.

        \* \* \*

    67.    [Child] had regular and ongoing behavioral problems at school his entire Kindergarten academic year. The Mother failed to notify the Father of these problems.

Appealed Order at 2, 4-10, 12-13.

A finding of fact is clearly erroneous only when there is no evidence in the record to support it directly or by inference. *Yanoff*, 688 N.E.2d at 1262. Based on careful review of the record, we conclude there is evidence in the record to support all but one of the challenged findings.[4]

## B. Challenged Findings

We begin our analysis with the only clearly erroneous finding. In finding 45, the trial court found that Father scheduled an appointment for Child at MBH, Mother was notified but did not attend, and Mother did not complete the necessary paperwork. Appealed Order at 9. In the GAL's updated report, she recommended that Child have a counseling appointment scheduled at MBH within ten days. *See* App. of Appellee, Vol. 2 at 10. Father initially contacted MBH to make the appointment; however, he was unable to schedule an appointment because Mother was the custodial parent and insurance carrier. *See* Tr., Vol. III at 20-21. Father relayed this information to Mother and she

---

[4] Mother claims many of the trial court's other findings are "mere surplusage[.]" Appellant's Brief at 15.

eventually scheduled an appointment for September 26, 2018. *Id.* at 21. Mother was unable to attend, so Father took Child to the appointment where he completed the necessary paperwork. *Id.* Although Father initially reached out to MBH to make the appointment, *Mother* scheduled the appointment because she was the custodial parent and insurance carrier. Therefore, only this portion of the trial court's finding is erroneous. Nonetheless, as discussed below, we conclude that despite this erroneous statement in finding 45, the remaining challenged and unchallenged findings are sufficient to support the trial court's modification order. *See In re A.S.*, 17 N.E.3d 994, 1003-06 (Ind. Ct. App. 2014) (holding that, in the context of a termination of parental rights proceeding, despite several clearly erroneous findings of fact, there was sufficient evidence to support the juvenile court's order terminating parental rights even absent the erroneous findings), *trans. denied*.

[23] Mother argues finding 8 is clearly erroneous because the parties never agreed to follow the Indiana Parenting Time Guidelines. However, the record reveals and finding 8 recites that Father *did* file an Information for Contempt in June 2018 *alleging* that he was entitled to extended summer parenting time and Mother failed to comply with the extended parenting time provision contained in the IPTG. *See* Appellant's App., Vol. 2 at 66-67. Here, the trial court is simply setting forth the pertinent procedural history of the case – not making any finding as to whether or not the parties agreed to follow the IPTG.

[24] The GAL's testimony supports finding 18 that Mother was uncooperative. At the September 17, 2018 hearing, the GAL testified, "Whenever I reached out to

[Mother] in the beginning to schedule the intake appointment, just to get the case started, she did not cooperate. . . . Meaning she didn't call me. She scheduled an appointment, canceled the appointment. Just didn't cooperate." Tr., Vol. II at 121. Although Mother may disagree with the finding and points to other evidence in the record to refute its accuracy, we cannot conclude there is *no* evidence in the record to support this finding.

[25] Mother contends finding 22 is "frankly shocking" because there is no evidence in the record to support a finding that Ms. Krohn believed Child *suffered* as a result of not attending preschool. Appellant's Brief at 15. On cross examination, Ms. Krohn agreed she reported to the GAL that "sometimes [Child] did not know how to act." Tr., Vol. II at 93. She testified that Child would display aggression with the other students. For example, "[m]aybe they didn't wanna play and [Child] did and he didn't know . . . how to respond to that." *Id.* Ms. Krohn also acknowledged she reported to the GAL that Child's behavior was not uncommon given that Child had never been in a formal school setting, such as preschool, before attending Kindergarten. *Id.* at 93-94. We conclude that the trial court's finding that the failure to attend preschool *affected* (not suffered, as Mother characterizes it) Child's behavior and socialization during Kindergarten is a reasonable interpretation of this testimony and not clearly erroneous.

[26] With respect to finding 23, Ms. Krohn testified that the agenda book required a daily signature and either Mother or Maternal Grandmother initialed or signed Child's agenda book. *See id.* at 83. For the GAL's updated report, she

reviewed Child's agenda book and noted there were sixty-six entries throughout the school year which reported Child had behavioral problems. *See* App. of Appellee at 5-6. Father testified he was not provided with the agenda book as it was never sent home with Child on the weekend. *See* Tr., Vol. III at 19. The GAL testified that Ms. Krohn had reported Child "was a bully" and noted that Father had believed Child was *being* bullied "because there [was] not the information being passed along from [Mother] through the agenda book, and gave a completely different view of what was happening in the classroom." *Id.*, Vol. II at 141. This evidence supports the trial court's finding.[5]

[27] Finding 27 concerns Child's last-minute Kindergarten enrollment. Mother argues this finding is clearly erroneous because it has "no bearing on whether there has been a substantial change in circumstances to justify a modification of custody" and she enrolled Child in Kindergarten within the enrollment period. Appellant's Br. at 18. However, this finding is supported by Father's testimony that he and Mother discussed enrolling Child in Castle Elementary school but

---

[5] Mother uses finding 23 to illustrate what she characterizes as "a significant issue in this case, that being the GAL's overall failure to stay as a neutral in the case and make recommendations in the best interests of [Child]. The GAL routinely sided with Father, which resulted in a biased or inaccurate report being submitted to the Court." Appellant's Br. at 17. At the September 17, 2018 hearing, with respect to a portion of the GAL's report and Child's pediatrician's testimony, Mother's attorney stated, "My hope is an unbiased individual that has had contact with [Child] could identify what type of – should [Mother] have been telling me that . . . he received a note in his agenda book . . . ." Tr., Vol. II at 184. Father objected to the GAL being characterized as biased. *Id.* Later, Mother's attorney conceded she "inadvertently implied" the GAL was biased or unbiased in the case, and the GAL confirmed she did not have any knowledge of either party, their significant others, family members, or anything else that would lead to bias. *See id.* at 222. Although Mother may have hinted that she believed the GAL was biased, she did not properly raise the issue before the trial court. Mother's failure to object to the GAL's report or raise this issue to the trial court results in waiver on appeal and as such, we decline to address it. *Thalheimer v. Halum*, 973 N.E.2d 1145, 1150 (Ind. Ct. App. 2012).

Mother "flat out told [him] no [because s]he didn't want to." Tr., Vol. III at 11. Instead, Mother enrolled Child in Hebron Elementary school at the end of July – several days before school began – without first communicating with Father. Father testified that a few days before school, "She just told me 'He's been enrolled'" and told Father what school supplies Child needed. *Id.* at 12. We find no error because the finding clearly relates to communication between the parties, a factor to be considered in modifying custody.

[28]  With respect to finding 31, Mother takes issue with the trial court's characterization of Dr. William Selby's, Child's pediatrician, testimony regarding Child's excessive touching of his private area in the classroom. Dr. Selby testified, "I would consider it to be *abnormal* but not alarming in any way, as ticks or behaviors like this are presented quite frequently in this age range and often are of no consequence." Tr., Vol. II at 178 (emphasis added). As such, the trial court's finding that Dr. Selby testified that Child "exhibited 'abnormal' behavior or a 'tick' in excessively touching his genitals" is not clearly erroneous. Appealed Order at 6.

[29]  Findings 33, 37 and 63[6] are supported by the GAL's July report, in which she stated: Child "potentially has identity issues as a result of having his twin pass away. This is further complicated by [Mother] clearly hyphenating [Child]'s last name on multiple occasions, which is not his legal name[;]" and Mother

---

[6] Mother contends this finding is "merely a rewording" of finding 37 and the same analysis applies. Appellant's Br. at 40.

worked past 6:00 p.m. on forty-two days, twenty-five of which were days where Child could have spent extra parenting time with Father instead of Maternal Grandmother, which the GAL believed was "very telling of [Mother] promoting [Maternal Grandmother]'s relationship with [Child] over [Father]'s, regardless of whether or not there was a court order." Appellant's App., Vol. 2 at 84, 86.

[30] In findings 38, 41, 43, 46-47, 49, the trial court found that Maternal Grandmother signed Child up for extracurricular activities; Mother does not believe Child needs counseling; Mother attended Child's second counseling session for the first time in February 2019; and Mother failed to inform the GAL she was in a relationship. These findings are supported by the following evidence in the record:

- In her July report, the GAL stated that Maternal Grandmother reported she signed Child up for various extracurricular activities. *Id.* at 80.

- The GAL's July report recommended that Child be enrolled in therapy. Mother testified she does not believe Child needs counseling and instead, sought a clinical assessment for Child with Ellsworth. *See* Tr., Vol. IV at 96-97, 99. The GAL testified that Mother "did it to refute what my recommendations were, not to promote [Child]'s best interest." Tr., Vol. II at 140; *see also* App. of Appellee, Vol. 2 at 137 (Mother's text message to Father stating Ellsworth is "seeing [Child] as a rebuttal to your

claims"). Therefore, the trial court's interpretation that Mother "refused to enroll" Child in counseling is reasonable. Appealed Order at 9, ¶ 41.

- Child had a second appointment at MBH scheduled for January 2019; however, Child was ill with the flu and the appointment was rescheduled for February 25. *See* Tr., Vol. III at 169. Mother was unable to attend the first appointment on September 26, 2018 because she had to work, and she participated in counseling for the first time at Child's second appointment on February 25. *See* Appellant's Br. at 36-37 (Mother does not challenge the accuracy of the finding 47 but rather how the finding allegedly "paint[s her] as an uninvolved parent").

- The GAL's July report indicated Mother was not in a relationship, which was true at the time. At the March 26, 2019 hearing, Mother testified that she had been in a relationship since September 2018 but never reported the relationship to the GAL. Tr., Vol. IV at 103-04.

Because there is evidence in the record to support each of these findings, we cannot conclude they are clearly erroneous. We find no error.

[31] Mother contends finding 44 is clearly erroneous because Ellsworth's clinical opinion that Child would not be harmed by counseling with a certified licensed counselor that understood custody/high conflict co-parenting issues differed from the GAL's general recommendation that Child begin counseling. *See* Tr., Vol. III at 113-14. The fact that Ellsworth may have been more specific and tailored her recommendation to the high conflict situation does not render the

trial court's finding that the two recommendations were not inconsistent clearly erroneous.

[32] With respect to finding 50, Mother claims the finding "mischaracterizes what [her ex-spouse's Facebook] post was truly about." Appellant's Br. at 38. Here, once again, Mother does not challenge the accuracy of her ex-spouse's testimony or the content of his Facebook post. Instead, she disapproves of the trial court's interpretation of the evidence and asks us to reweigh the evidence, which we cannot do. *D.C.*, 977 N.E.2d at 954.

[33] In finding 51, the trial court found Mother denied ever being arrested. Mother argues she was confused by the line of questioning – causing her to answer incorrectly. At the March 26 hearing, when asked, "Have you ever been arrested[?]" Mother responded "No." Tr., Vol. IV at 74. Later, when presented with her arrest record, Mother admitted she had been arrested and explained she turned herself in. *Id.* at 91. Given this evidence, we find no error.

[34] Mother contends finding 62 is clearly erroneous because she was unaware that she was required to provide Father with her work schedule beyond the summer as the June 27, 2018 order only addressed summer parenting time. *See* Appellant's Br. at 39. Mother concedes she did not provide Father with her work schedule from the end of summer until February 2019 and we conclude the trial court's interpretation of its own order is sufficient to support this finding.

[35]     Finding 64 concerns Mother's violation of the June 27 order prohibiting her from utilizing a third party to transport Child. Mother concedes that she allowed Maternal Grandmother to transport Child and at trial, Mother also conceded that she understood the order but agreed that she violated it anyway. Tr., Vol. IV at 96. As such, this finding is not clearly erroneous.

[36]     Findings 39 and 67 concern Mother's failure to enroll Child in preschool and inform or notify Father of Child's behavioral issues at school, medical appointments, extracurricular activities, and opportunities for additional parenting time. *See* Appealed Order at 7-8, 13. Mother argues the "only evidence to support [these findings] is Father's self-serving testimony, and a biased or inaccurate GAL report based only on Father's statements." Appellant's Br. at 25 (internal quotation omitted). Here, Mother acknowledges there is evidence to support these findings – she just disagrees with the weight the trial court assigned to Father's testimony and the GAL's reports. Mother's argument is simply a request for this court to reweigh the evidence and assess witness credibility in her favor, which we cannot do. *D.C.*, 977 N.E.2d at 954. Nonetheless, we conclude there is ample evidence in the record to support the trial court's findings:

- Father testified that he obtained information about several preschools, visited them, and provided this information to Mother; however, he "pretty much got a no [from Mother]. . . . I would give her information. . . . She said no." Tr., Vol. III at 10-11. Mother also testified that she and Father discussed preschool but "just couldn't agree on where[,]" so Child

was never enrolled. Tr., Vol. IV at 53. Further, the GAL wrote in her report that Child "did not go to preschool due to a lack of co-parenting." App. of Appellee, Vol. 2 at 9.

- The GAL testified that Father observed a bite mark on Child's arm during parenting time and contacted the school directly to find out what happened. Tr., Vol. II at 217. Ms. Krohn also testified that Father reached out to her via email asking whether Child was being bullied – referring to the biting incident. *See id.* at 90; *see also Id.*, Vol. IV at 40 (Mother's testimony indicating she was aware of the biting incident).

- Ms. Krohn testified that on April 17, 2018, she, Mother, and the Assistant Principal met to discuss Child's behavior of holding his private parts. *See* Tr., Vol. II at 91. The GAL reported that Mother failed to inform Father of the biting incident, the school conference regarding Child holding his private parts during class, and extracurricular activities.[7] Appellant's App., Vol. II at 86.

- Father testified that he was not aware of most of Child's medical appointments until after they were over. *See* Tr., Vol. III at 50-51. In addition, the GAL's September report found that Mother "only informed [Father] of two (2) doctor's appointments out of ten (10) as documented

---

[7] Although Mother points to several examples in which she provided information on extracurricular activities via text message to Father, the GAL reported that Mother failed to inform Father of these activities and we must view the evidence most favorably to the trial court's judgment. *D.C.*, 977 N.E.2d at 954.

by Dr. Selby's medical records. On September 7, 2017, [Mother] informed [Father] after she was already on her way to the appointment [and then] after an appointment on December 26, 2017." App. of Appellee, Vol. 2 at 7.

- The GAL indicated in her September report that Father was not notified that Child had regular and ongoing behavioral issues at school throughout the year. *Id.* at 9. Throughout Child's Kindergarten year, there were sixty-six entries in his agenda book where Child was cited for lack of self-control in the classroom, *id.* at 5-6, but Father testified he never saw the agenda book, tr., vol. III at 19.

- In the GAL's July report, she reviewed Mother's work schedule from January 8 through June 15, 2018 and found forty-two days on which Mother worked past 6:00 p.m. and twenty-five of those days were days when Child could have had extra parenting time with Father instead of being with Maternal Grandmother. Appellant's App., Vol. II at 84-86.

[37] In addition to her challenges to specific findings, Mother argues that the trial court's findings are inadequate because "the vast majority of [them] merely recite witness testimony or procedural history[.]" Appellant's Br. at 11. Indeed, "[a] finding of fact must indicate, not what someone said is true, but what is determined to be true, for that is the trier of fact's duty." *Moore v. Ind. Family & Soc. Servs. Admin.,* 682 N.E.2d 545, 547 (Ind. Ct. App. 1997). However, we disagree with Mother.

[38] Based on how the trial court articulated its findings, we conclude that its findings are not merely a litany of each witnesses' testimony. Rather, the trial court, as trier of fact, picked out aspects of testimony it determined to be credible and established those as facts. This is not a "he said/she said" situation, in which the trial court simply provides a recitation of each witnesses' testimony. *Cf. Hazelett v. Hazelett*, 119 N.E.3d 153, 159-60 (Ind. Ct. App. 2019) (remanding custody order after holding that the trial court's findings of fact were "merely a recitation of *each party's* contentions, arguments, proposed findings, and portions of relevant statutory provisions" and therefore, were an inadequate basis for the appellate court to determine whether the trial court made a proper custody determination) (emphasis added). Viewing the trial court's findings as a whole, it is clear that the trial court, through these findings, made credibility determinations. It is the trial court that listened to the testimony over the course of nine days, directly interacted with the parties, and assessed the witnesses' "credibility and character through both factual testimony and intuitive discernment[,]" tasks solely entrusted to the trial court. *Best*, 941 N.E.2d at 502. The fact that the modification hearing took place over nine days only supports our conclusion that the trial court carefully selected the portions of testimony it found as fact. And we will not second guess the trial court in this regard.

[39] In sum, despite one erroneous provision contained in finding 45 (that Father made the September counseling appointment at MBH for Child when *Mother*

actually made the appointment), we conclude the evidence in the record supports the challenged findings and therefore, they are not clearly erroneous.

## B. Conclusions of Law

[40] Next, Mother challenges the trial court's modification of physical custody in favor of Father. Specifically, she contends that the trial court's findings are insufficient to support such modification because they "are completely devoid of any mention of the Best Interests Factors [and] fail[] to make one (1) finding[] as to how, or why a custody modification would be in the best interest" of Child. Appellant's Br. at 42-43. She contends that the trial court "simply makes a generalized statement that 'a substantial change has occurred' yet failed to say what substantial change occurred. Clearly, no substantial change occurred based on the trial court's [f]indings. More importantly, the trial court failed to find that modification would be in the best interests" of Child. *Id.* at 43. We disagree.

[41] A modification of custody in the paternity context is governed by Indiana Code section 31-14-13-6, which allows a trial court to modify a child custody order only if modification is in the child's best interests and a substantial change in one or more of the designated statutory factors has occurred. The trial court must consider all relevant factors, including:

  (1) The age and sex of the child.

  (2) The wishes of the child's parents.

(3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.

(4) The interaction and interrelationship of the child with:

(A) the child's parents;

(B) the child's siblings; and

(C) any other person who may significantly affect the child's best interest.

(5) The child's adjustment to home, school, and community.

(6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic or family violence by either parent.

(8) Evidence that the child has been cared for by a de facto custodian, and if the evidence is sufficient, the court shall consider the factors described in section 2.5(b) [de facto custodian factors] of this chapter.

Ind. Code 31-14-13-2.

[42] A substantial change in any one of these factors is sufficient to support modification of custody. *K.I. ex rel. J.I. v. J.H.*, 903 N.E.2d 453, 460 (Ind. 2009). The trial court must consider all relevant factors, but it is not required to make specific findings on each factor unless requested to do so by the parties. *H.H. v. A.A.*, 3 N.E.3d 30, 36 (Ind. Ct. App. 2014). Here, Mother filed a request for

specific findings of fact. In making a determination regarding modification of custody, the trial court may not hear evidence of things occurring before the last custody proceeding unless it relates to a change in the factors relating to the child's best interests. Ind. Code § 31-14-13-9.

[43] Here, listed under "Significant Events Regarding Resolution of Pending Issues" of the order, the trial court made extensive findings with respect to Child's schooling, custody, and parenting time. Appealed Order at 4. Taking the trial court's order as a whole, it is apparent that it did consider the best interest factors and then made extensive and specific findings on the applicable factors, including Child's age, his relationships and adjustment to both homes and school, his documented behavioral and health issues, and domestic violence between the parents:

- Child is seven years old and had a twin who passed away. *Id.*, ¶¶ 16-17.

- Child was not enrolled in preschool, which "affected his socialization and behavior during Kindergarten." *Id.* at 5, ¶ 22.

- Child has exhibited various behavioral issues throughout his Kindergarten school year. *Id.* at 6, 13, ¶¶ 31, 66-67. And Mother has demonstrated a pattern of failing to communicate these issues to Father. *Id.* at 5, 13, ¶¶ 23, 67.

- Child potentially has identity issues as a result of his twin passing away; Mother has contributed to these issues by failing to change Child's legal

name as the parties agreed, and Mother was ordered by the court to submit the necessary paperwork on March 26, 2019. *Id.* at 6-7, ¶¶ 32-36.[8]

- Mother allows Maternal Grandmother to co-parent Child and sign Child up for numerous extracurricular activities. *Id.* at 7, ¶¶ 37-38.

- Mother does not co-parent or communicate with Father as demonstrated by her failure to enroll Child in preschool and failure to inform Father of important decisions or issues in Child's life, including medical appointments, extracurricular activities, and behavioral issues. *Id.* at 7-8, ¶ 39.

- The GAL identified Child's specific problems and recommended that Child begin therapy to address these issues, such as appropriate boundaries with his body, identity of family members, and coping skills. *Id.* at 8-9, ¶¶ 40, 42.

- Mother disagreed that Child needed counseling and instead of getting Child into counseling, Mother sought a mental health assessment for Child to refute the GAL's recommendation. *Id.* at 9, ¶¶ 41-44.

- In January 2016, Mother was arrested for domestic battery committed against Father with Child present. *Id.* at 10, ¶ 51.

---

[8] It appears the trial court inadvertently listed two separate findings as finding 35.

- Mother failed to provide her work schedule to Father from the end of summer 2018 to February 25, 2019, in violation of the June 27 order. As a result, Mother "effectively den[ied] the Father opportunities" for additional parenting time. *Id.* at 12, ¶ 62. During this time, Mother worked past 6:00 p.m. on forty-two days – twenty-five of which were days where Child was with Maternal Grandmother, but Father could have had extra parenting time. The GAL reported that Mother promotes Child's relationship with Maternal Grandmother over Father. *Id.* at 12, ¶ 63.

- The GAL recommended that primary physical custody be changed to Father. *Id.* at 6, ¶ 28.

[44] These findings address a substantial change in Child's schooling, relationships, behavior, and adjustment to both homes and school, as well as domestic violence between the parents. Contrary to Mother's argument, by going through each of the applicable best interest factors, the trial court *is* finding that modification is in the Child's best interests. It is clear the trial court afforded substantial weight to the GAL's reports and testimony and Mother's arguments constitute an invitation for this court to reweigh the evidence and assess witness credibility in her favor, which we cannot do. *D.C.*, 977 N.E.2d at 954. Nonetheless, we may affirm the trial court's modification order on any legal theory supported by the findings, *Werner*, 946 N.E.2d at 1244, and we conclude the findings support the trial court's order modifying physical custody.

[45] Because the evidence in the record supports the trial court's findings, which support the modification order, we conclude the trial court's judgment was not clearly erroneous.[9]

## Conclusion

[46] We conclude the evidence supports the findings and those findings support the trial court's modification order. As such, the trial court's judgment was not clearly erroneous. Accordingly, we affirm.

[47] Affirmed.

May, J., and Vaidik, J., concur.

---

[9] One of the significant issues in this case was Mother's unavailability to spend time with Child – leaving Maternal Grandmother to essentially be Child's primary custodian and thereby preventing any additional parenting time for Father. Nonetheless, Mother asks this court to reverse the trial court's order awarding Father primary physical custody. Under the circumstances of this case, the trial court's order awarding joint legal custody and extra parenting time for Mother is extremely generous.